UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CORA D. GARRETT, f/k/a
CORA D. PANE,

                      Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                      Defendant.

DECISION AND ORDER

05-CV-6524 CJS

_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Gregory T. Phillips, Esq.<br>Segar & Sciortino<br>400 Meridian Centre, Suite 320<br>Rochester, New York 14618 |
| For the Defendant: | Terrance P. Flynn, Esq.<br>United States Attorney for the<br>Western District of New York<br>Christopher V. Taffe, Esq.<br>Assistant United States Attorney<br>100 State Street<br>Rochester, New York 14614 |

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is defendant's motion for judgment on the pleadings [#8] and plaintiff's cross-motion [#12] for the same relief. For the reasons stated below, defendant's motion is denied, and plaintiff's motion is granted to the extent that it seeks a remand to the Commissioner for further administrative proceedings.

PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about May 16, 2002, claiming to be disabled due to pain from a herniated disc in her lower back, nerve damage in her buttocks, headaches, anxiety, thyroid problems, and hypertension . (83, 95, 100)[1][2]. Plaintiff, who was employed as a Developmental Aide, indicated that she became unable to work on October 7, 2000. (100).  The Commissioner denied the application, finding that plaintiff was capable of performing light work. (84-87).  A hearing was held before an Administrative Law Judge ("ALJ") on June 10, 2004, after which the ALJ denied benefits. (19-30).  Plaintiff appealed to the Appeals Council (7-12), however, on July 26, 2005, the Appeals Council declined to review the ALJ's determination. (4-6).

MEDICAL EVIDENCE

Plaintiff has long-standing medical problems related to migraine headaches, lower-back pain, and depression.  Plaintiff, who was 48 years of age at the time of the hearing in this matter, has experienced migraine headaches since her twenties.  Since at least 1994, plaintiff has also experienced pain in her lumbosacral spine. (173).  On or about August 28, 2000, plaintiff further injured her lower back while she was working as a Developmental Aide.  On that date, plaintiff was placing a wheelchair-bound patient onto a wheelchair lift when she accidentally "backed into a sharp fork on the mechanism." (258)  Subsequently, plaintiff experienced severe lower back pain, and her headaches also became more frequent.  Plaintiff continued to work for two days

---

[1]Citations are to the administrative record unless otherwise noted.

[2]In connection with her application for disability benefits, plaintiff was interviewed by one of the Commissioner's employees, who observed that plaintiff appeared to have difficulty concentrating, sitting, standing, and walking. (111-112)

2

following the accident, but then was out of work for approximately one week. (258) Plaintiff returned to work for approximately six weeks.  However, on October 7, 2000, plaintiff stopped working altogether due to back pain. (258) In February 2001, plaintiff fell on stairs, again injuring her lower back. (122-139).  In October 2001, plaintiff further injured her back in a motor vehicle accident, when her car was "rear ended." (157)

In or about 1994, plaintiff began treating with a neurologist, Heidi Schwarz, M.D. ("Schwarz"), for her headaches and lower-back pain. (156-173).  In October 2000, plaintiff began treating with her primary care physician, Lisa Walk-Reinard, M.D. ("Walk-Reinard"). (102) In or about March 2001, Walk-Reinard referred plaintiff to Steven Lasser, M.D. ("Lasser"), an orthopedic specialist. (103) Lasser subsequently referred plaintiff to a pain specialist, Donovan Holder, M.D. ("Holder").   The office notes of Schwarz, Walk-Reinard, Lasser, and Holder are very briefly summarized below.

On September 9, 1994, Schwarz examined plaintiff regarding plaintiff's "migraines and lumbosacral radiculopathy." (173) Schwarz indicated that plaintiff was experiencing back pain at work, especially when putting diapers on adult patients. (Id.) Schwarz reported that plaintiff was having "muscle stiffness and radicular symptoms." (Id.)  Schwarz prescribed Inderal for plaintiff's headaches, and Motrin for plaintiff's back pain.  On June 13, 1995, Schwarz prescribed Fioricet for plaintiff's migraines. (171) On April 14, 2000, Schwarz noted that plaintiff's headaches were "clearly worse," which was apparently related to stress from plaintiff's job. (163) On August 25, 2000, Schwarz stated: "Although I think there is a migrainous component to these headaches, they they are clearly exacerbated by the chronic pain she has been experiencing in her back and legs and the muscle spasm which has traveled up to her left paracervical region."

3

(162) On December 26, 2000, Schwarz reported that, on examination, plaintiff was "clearly uncomfortable and shifting frequently in the chair due to hip pain," and had "marked paracervical muscle spasm on the left side." (160) On March 5, 2001, Schwarz noted that plaintiff was continuing to "struggle with frequent headaches," and stated: "I feel that her chronic low back pain aggravates her long standing headache pattern." (159) On July 2, 2001, Schwarz noted that plaintiff was continuing to have "fairly frequent headaches," and has been to the ER twice recently for headache pain. (158) On October 25, 2001, Schwarz indicated that plaintiff "continues to struggle with chronic migraines," which were exacerbated by her back injury in 2000 and her motor vehicle accident in October 2001, and stated: "I don't feel that any medication change that I make for her migraines will improve her headache control until her back and neck are improved." (157) On March 5, 2002, Schwarz reported that plaintiff was continuing to have "daily headaches and occasional severe headaches," as well as "chronic low back pain," though her pain from these conditions was "tolerable." (156)

On August 27, 2002, Walk-Reinard examined plaintiff and indicated that plaintiff was "in obvious pain and winces and moans whenever she moves her lower back." (509) Walk-Reinard noted that there was "pain on palpation of the paraspinal muscles, level of L5-S5, [left] greater than [right]." (Id.) Walk-Reinard noted that plaintiff was taking a number of medications, including Oxycontin, Vioxx, Fioricet, Amitriptyline, and Imitrex. (509-510) On September 25, 2002, Walk-Reinard examined plaintiff again, and noted that, since plaintiff's last office visit, Worker's Compensation had denied Dr. Holder's request to perform additional pain-relief injections on plaintiff's lumbo-sacral spine. (505) Walk-Reinard noted that plaintiff's depression was "stable on Paxil." (Id.)

4

Walk-Reinard's impression was "[l]eft sacroiliitis with chronic low back pain. Chronic severe mechanical low back pain c [sic] left sciatic and SI joint dysfunction, degenerative disc disease of the lumbar spine." (Id.) Walk-Reinard opined that plaintiff was "totally disabled from work at this time." (507) Walk-Reinard examined plaintiff again on November 20, 2002, and noted that plaintiff was in additional pain, because she was unable to afford her prescription of Oxycontin. (503) On January 8, 2003, plaintiff told Walk-Reinard that her depression had worsened, because she was not able to afford her prescription of Paxil. (501) On examination, Walk-Reinard observed that plaintiff had paraspinal muscle tenderness from L5 to S5, with minimal tenderness along the thoracic spine. (502) Walk-Reinard again opined that plaintiff was totally disabled. (Id.) On December 23, 2003, Walk-Reinard examined plaintiff, and reported that plaintiff was still having "sacral and buttock pain." (479) Plaintiff told Walk-Reinard that Dr. Holder had wanted to attempt a further pain-relief procedure, namely, cauterization, but that Worker's Compensation had denied his request for payment. (Id.) Plaintiff also reported that, since her last office visit, she had attempted to work part-time for approximately one month, but had quit the job due to back pain. (Id.) On examination, Walk-Reinard observed that plaintiff walked "with a stiff arthralgic gait," and had "some difficulty getting on to and off the exam table." (480) Straight leg test was positive on the left side, and plaintiff had "marked tenderness" over the left buttock region. (480) Walk-Reinard stated that plaintiff remained "totally disabled." (Id.) On March 8, 2004, Walk-Reinard again saw plaintiff, at which time plaintiff's condition was essentially unchanged. Walk-Reinard next saw plaintiff on May 13, 2004, at which time plaintiff indicated that her back pain persisted, although she was having some relief

from Lidocaine patches prescribed by Dr. Lasser. (518) Walk-Reinard noted that plaintiff's depression was "stable on current meds." (518)

On July 11, 2001, Lasser examined plaintiff and stated: "I feel that she can perform only very sedentary type of work that requires frequent shifting of positions and no more than 5-10 lbs of lifting." (257)  On August 31, 2001, Lasser saw plaintiff and reported that "[a]ny activity or positioning increases her pain.  She cannot be up for more than one hour before the pain increases severely." (256)  On November 8, 2001, Lasser examined plaintiff and found that she was "tender principally around the lumbosacral junction and into the left gluteal region." (255) Lasser's impression was: "Symptoms consistent with L5-S1 herniated disc with degenerative disc disease." (Id.) On February 20, 2002, Lasser examined plaintiff and found her to be "tender at the lumbosacral junction." (253)  Lasser's impression was: "Severe persistent lower back pain secondary to lumbar disc disease at L5-S1." (Id.)  On June 5, 2002, Lasser obtained a CT scan of plaintiff's back, which showed "mild disc degeneration, small midline protrusion at the L5-S1 level without root impingement, mild degenerative changes in the L5-S1 facet joints." (251) On that same date, Lasser obtained a lumbar myelogram, which showed "evidence of mild disc degeneration without herniation or stenosis." (252) On December 4, 2002, Lasser examined plaintiff and noted that her back was tender, and her lumbar motion was limited. (465) He reviewed an MRI which, according to Lasser, demonstrated "a compression fracture deformity about 20% at the T12.  There is a small disc protrusion, left sided at L5-S1 with degenerative changes in the L5-S1 disc." (Id.)  Lasser additionally stated, "I have [sic] do not feel that she is capable of any type of work at this time." (Id.)

On March 19, 2002, Holder examined plaintiff, and noted that an "MRI of the lumbar spine showed degenerative disc and bone changes throughout the lumbosacral [region], most significant at L5-S1 where there is a diffuse disc bulge as well as a more focal disc extrusion centrally." (272)  Holder further noted that plaintiff had "increased discomfort" with full extension of her spine, and "marked 3+ tenderness overlying the left sacroiliac joint," though the remainder of the exam was unremarkable. (272-73) Holder's impression was "left sacroiliitis with chronic low back pain," and he recommended that plaintiff "undergo a series of left sacroiliac joint blocks." (273)  On June 30, 2002, Holder completed a disability report. (260-273) Holder reported that his "physical findings [were] consistent with the patient's level of pain." (266) Subsequently, Holder performed sacroiliac joint blocks, on July 8, 2002 and July 25, 2002, however, these gave plaintiff no relief. (471-72, 473) On May 6, 2004, Holder performed Radiofrequency Neurolis [a procedure that temporarily destroys nerves for pain relief] on plaintiff's left sacroiliac joint. (530)  However, this procedure also failed to provide relief to plaintiff.

On August 6, 2002, plaintiff was given an independent psychiatric evaluation by non-treating psychologist Christine Ransom, Ph.D. ("Ransom").  With regard to plaintiff's "current functioning," Ransom noted that plaintiff reported feeling depressed, despite taking Paxil and Amitriptyline, and "continues to have constant dysphoric mood, crying spells, irritability, and is actually more often angry than crying." (365) Plaintiff reported being socially withdrawn.  Plaintiff also reported having "some difficulty with dressing, bathing and grooming herself due to pain.  She does not cook and gets meals made by her neighbor.  Her [adult] daughter helps her with cleaning, laundry and

shopping due to pain." (367)  On examination, Ransom found plaintiff's immediate memory to be mildly impaired and her recent memory moderately impaired.  Ransom indicated that, "[t]he results of the evaluation appear to be consistent with the claimant's allegations." (Id.)  Ransom's impression, in relevant part, was "[d]epressive disorder, currently mild and partly resolved on medication," with a prognosis of "fair to good, as depression is resolving but not completely gone." (368)

On August 6, 2002, plaintiff was given an independent internist evaluation by non-treating physician James Tacci, M.D. ("Tacci").  Notably, Tacci indicated that he would not evaluate plaintiff's complaints of back pain, emotional problems, or headaches, as those should be addressed by specialists. (369) Tacci did, however, examine plaintiff with regard to complaints regarding hypertension and thyroid problems. (Id.)  According to Tacci, plaintiff told him that she had quit smoking "5-1/2 years ago," and was able to carry a small bag of groceries or a gallon of milk. (371) Tacci further reported: "Claimant reports that she is able to cook meals, do laundry, shop for food and clothing, manage money, socialize with friends, and bathe, shower, and dress herself." (Id.)  Plaintiff also reported having difficulty "walking, sitting, riding, and driving." (Id.)  On examination, Tacci observed that plaintiff appeared to be in no distress, her gait was normal, and she needed no help getting on and off the exam table. (372) Tacci found that plaintiff's lumbar spine had "full flexion," with "no spasm or point tenderness."  Tacci indicated that an x-ray of the lumbosacral spine showed "slight to mild degenerative changes." (374) Overall, Tacci opined that plaintiff "should have a minimal degree of limitation," "at most," and that she need only avoid heights and avoid operating heavy machinery." (373)

On October 16, 2002, plaintiff's records were examined by a non-treating, non-examining agency medical consultant, psychiatrist George Burnett, M.D. ("Burnett"). Burnett completed a residual functional capacity assessment, indicating that plaintiff was "moderately limited" with regard to the following: 1) carrying out detailed instructions; 2) maintaining concentration and attention fo extended periods; 3) performing activities within a schedule and maintaining regular attendance; 4) working with others without being distracted by them; 5) working a normal workday and workweek without interruptions from psychological symptoms and without rest periods; 6) accepting instructions and criticism from supervisors; 7) responding appropriately to changes in the work setting; and 8) setting realistic goals and planning independently. (439-440) Burnett further indicated that plaintiff was "moderately" limited in her ability to maintain concentration, persistence, and pace, and "mildly" limited in her activities of daily living and social functioning. (455)

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in

9

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has non-exertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. §

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach,

416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include

---

handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4] 20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

> statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> \*\*\*
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a). The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

## THE ALJ'S DECISION

At the hearing before the ALJ, plaintiff testified that she was 48 years old and had earned a GED diploma. (43-44) Plaintiff was employed by the Department of Social

Services as a Developmental Aide and Supervisor for approximately 17 years, before she stopped working in October 2000. (44) In her work as a Developmental Aide, plaintiff cared for individuals with developmental disabilities, and in that regard, she was required to, among other things, lift them, bathe them, which required a great deal of bending and twisting, dress them, and transport them in wheelchairs. (49)

Plaintiff testified that she has headaches on a daily basis, and had migraine headaches at least once every few months. (51) Plaintiff stated that her daily headaches last from between two to six hours. (52) Plaintiff testified that she has daily, continuous back pain, which interferes with her ability to sleep at night and interferes with her activities of daily living. (53) Plaintiff stated that the epidural injections by Dr. Holder did nothing to relieve her pain. (53) Similarly, plaintiff stated that the Radiofrequency Neurolis procedure which Holder performed did not alleviate her pain. (55) Plaintiff indicated that all of her pain medications cause her to have an upset stomach, for which she takes Prevacid. (64) As for her activities of daily living, plaintiff stated that she is able to perform light housework, such as cleaning and dusting, for only about thirty minutes before she has to stop due to pain. (60-61) Plaintiff further stated that she prepares her own meals, though she eats more fast food than she used to. (62)

Following plaintiff's testimony, the ALJ took testimony from a vocational expert ("VE") concerning step five of the sequential analysis and plaintiff's ability to perform other work. In that regard, the ALJ posed a lengthy hypothetical question, in which he asked the VE to assume, among other things, a person who could: 1) lift and carry 20 pounds occasionally; 2) lift and carry 10 pounds frequently; 3) stand for at least four hours per day total, and stand for periods of up to one hour at a time; and 4) sit for five

to six hours per day, and sit for periods of up to one hour at a time. The ALJ asked the VE to further consider that the person would be moderately impaired by irritable moods, moderately impaired in her ability to concentrate and focus, and have only a fair ability to interact with supervisors. (66-67) In response, the VE indicated that there were jobs which plaintiff could perform at both the light and sedentary exertion levels. Specifically, these jobs included: 1) program aide in a group home (light); 2) case aid or integration aid (light); 3) teacher's aide (light); 4) mail room clerk (light); 5) telephone marketer (sedentary); 6) sales attendant (sedentary); and 7) ticket seller (sedentary). (69-72) On cross-examination, plaintiff's counsel asked the VE, among other things, whether plaintiff would be able to perform any of these jobs, assuming that she would need to frequently lie down for two to three hours. (81) The VE responded that there were no jobs that such a person could perform. (Id.)

As already, mentioned, the ALJ subsequently issued a decision denying benefits. At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. (20). At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments: obesity, sinusitis with headaches, "degenerative pathology of the dorso-lumbar spine with radicular pain," migraine headaches, nearsightedness, and depression. (20-22) At the third step of the sequential analysis, the ALJ found that plaintiff's "severe impairments" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (23-24). In making this determination, the ALJ found that plaintiff had "only mild restrictions of daily living," "moderate difficulties in

maintaining social functioning," and "mild to moderate difficulties in maintaining concentration, persistence or pace." (23).  The ALJ found, in that regard, that plaintiff was able to cook, do laundry, shop, manage money, socialize with friends, shower, and dress herself.

At the fourth step of the analysis, the ALJ made a determination as to plaintiff's residual functional capacity ("RFC"), in which he stated, in relevant part, that plaintiff could frequently lift and carry 10 pounds, occasionally carry 20 pounds, stand for at least four hours per day, and sit for five to six hours per day. (26).  The ALJ stated that, in reaching this conclusion, he had considered all of plaintiff's "subjective allegations" in accordance with the requirements of SSR 96-7p, and had weighed the opinions of medical sources as required by 20 CFR § 404.1527; SSRs 96-2p and 96-6p. (25).  In that regard, the ALJ indicated that he gave "significant weight" to the opinions of Dr. Ransom and Dr. Burnett.  However, the ALJ did not mention the opinions of any treating physicians, nor did he indicate what weight, if any, he gave them.[5]   Additionally, in making his RFC finding, the ALJ concluded that plaintiff was exaggerating the extent of her limitations, and he found her credibility to be "only fair at best." (24) In that regard, the ALJ noted that, during her examination by Dr. Tacci, plaintiff apparently told him that she had quit smoking, when she actually had not. (24)  Similarly, the ALJ found that, as described above, plaintiff gave inconsistent accounts regarding her ability to do household chores to Tacci and Ransom. (25, 367, 371) The ALJ also found it damaging

---

[5]In the section of his decision dealing with the severity of plaintiff's impairments, the ALJ mentioned Dr. Holder by name, and referred to reports by Doctors Lasser, Schwarz, and Walk-Reinard by exhibit number. (21) However, the ALJ never mentioned Lasser, Schwarz, or Walk-Reinard by name, nor did he explain what weight he gave to the opinions of any of the treating doctors, in evaluating plaintiff's RFC.

15

to plaintiff's credibility that her pain was "usually a 5 on a scale of 1 to 10." (271, 25) Finally, the ALJ questioned plaintiff's credibility, based on the fact that "she was not using her pain medication because she could not afford it." (25)  Nevertheless, based upon this RFC, the ALJ concluded that plaintiff could not perform her past relevant work.

However, at the fifth step of the sequential analysis, the ALJ concluded that plaintiff could perform the two jobs identified by the VE at the hearing. (27-28) Consequently, the ALJ concluded that plaintiff was not disabled.

ANALYSIS

Plaintiff contends that the ALJ erred in two respects.  First, she maintains that the ALJ failed to give proper weight to the opinions of treating physicians, while giving undue weight to non-treating medical sources.  And second, she alleges that the ALJ failed to properly evaluate her credibility.

With regard to the ALJ's treatment of medical opinions, plaintiff contends that it was error for the ALJ to give "significant weight" to the opinions of Ransom and Burnett, while failing to explain what weight he gave to the opinions of Walk-Reinard, Lasser, or Holder.  The Court agrees that it was error for the ALJ to fail to explain how he weighed the opinions of plaintiff's treating physicians.[6]  The Court questions the fact that the record contains no RFC assessments from any of plaintiff's treating physicians, apart from one by Holder, completed in 2002, in which he indicated that he had no opinion

---

[6]With regard to Burnett's opinion, this Court has repeatedly found, and continues to believe, that the opinions of non-treating, non-examining agency medical review doctors are generally entitled to little, in any weight.

16

regarding plaintiff's ability to work at that time. Accordingly, the case must be remanded for a new hearing. On remand, the ALJ should develop the record by obtaining RFC assessments from plaintiff's treating physicians that quantify plaintiff's exertional impairments, especially her ability to sit and stand, as well as her non-exertional impairments.

Plaintiff also contends that the ALJ failed to properly assess her credibility. For example, plaintiff contends that the ALJ failed to consider her long history of steady employment prior to the onset of her alleged disability. The Court agrees that the ALJ should have considered plaintiff's "efforts to work," including her history of work as a Developmental aide and her subsequent unsuccessful attempt to work part-time. *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) ("ALJs are specifically instructed that credibility determinations should take account of "prior work record.") (citing SSR 96-7p, 61 Fed.Reg. 34,483, at 34,486 (1996)). It was also improper for the ALJ to question plaintiff's credibility based solely on her inability to afford pain medication. *See, Iuteri v. Barnhart*, No. Civ. 3:03CV393(MRK), 2004 WL 1660580 at *12 (D.Conn. Mar. 26, 2004) ("[I]n assessing credibility, the ALJ has a duty to inquire about possible explanations for non-compliance, or for lack of treatment. . . . Such explanations may include the following: . . . the individual may be unable to afford treatment and may not have access to free or low-cost medical services....") (citing SSR 96-7p). Moreover, to the extent that the ALJ found inconsistencies in plaintiff's statements to Tacci and Ransom, on remand he should seek an explanation from plaintiff. As to that, for example, it seems improbable that plaintiff would have lied to a single doctor (Tacci) about her tobacco use

when she readily admitted her long history of smoking to every other medical source to whom she spoke.

## CONCLUSION

Accordingly, for the reasons discussed above, defendant's motion for judgment on the pleadings [#8] is denied, and plaintiff's cross-motion [#12] for the same relief is granted, to the extent that it seeks a remand to the Commissioner for further administrative proceedings. The matter is remanded for a new hearing pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
     July 18, 2007

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge